UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PAMELA PEAK,

     Plaintiff,

     v.

EDWARD M. KENNEDY INSTITUTE FOR
THE UNITED STATES SENATE, INC.,
BRUCE A. PERCELAY, and ADAM HINDS.

     Defendants.

Civil Action No: _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Now comes Plaintiff, Pamela Peak ("Ms. Peak"), by and through her undersigned counsel, and as for her Complaint against the Edward M. Kennedy Institute for the United States Senate, Inc. (the "Institute"), Bruce A. Percelay ("Percelay"), and Adam Hinds ("Hinds") (collectively "Defendants"), alleges as follows:

### Parties and Jurisdiction

1.     Pamela Peak ("Peak") is a citizen and resident of Wellesley, Massachusetts.

2.     The Institute is a non-profit corporation organized under the laws of Massachusetts. Its principal place of business is located at 210 Morrisey Boulevard, Boston, MA, 02125.

3.     At all times relevant to this complaint, Percelay was the Chairman of the Board for the Institute and, upon information and belief, a resident of the Commonwealth of Massachusetts.

4.     At all times relevant to this complaint, Hinds was the Chief Executive Officer of the Institute and, upon information and belief, a resident of the Commonwealth of Massachusetts.

5.     This Court has jurisdiction over Ms. Peak's claims under Title VII of the Civil Rights Act of 1964, § 701 *et seq.*, 42 U.S.C. § 2000e, *et. seq.* ("Title VII") pursuant to 28 U.S.C §

1

1331 because those claims arise under the laws of the United States.

6.     This Court has jurisdiction over Ms. Peak's remaining claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as her Title VII claims and arise from the same nucleus of operative facts.

7.     The Court has personal jurisdiction over the Defendants pursuant to M.G.L. c. 223A, §§ 2 and 3.

8.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred within this District, namely in Boston, Massachusetts in the County of Suffolk.

9.     Ms. Peak filed a Charge of Discrimination ("Charge") with the Massachusetts Commission Against Discrimination ("MCAD") and Equal Employment Opportunity Commission ("EEOC") on May 23, 2025.

10.     Ms. Peak withdrew her Charge from the MCAD and EEOC after 90 days to pursue her claims in court, and thereafter received a Right to Sue letter from the EEOC to pursue her Title VII claim in court.

## Facts

11.     Ms. Peak is a seasoned professional in her field, with over twenty years' experience as a Chief Development Officer and non-profit executive, along with various other positions that brought her in connection with political entities and organizations fostering civic participation and education.

12.     Ms. Peak learned of an opening for the position of Chief Development Officer at the Institute and, on August 25, 2023, submitted her application to be considered for the position.

13.     The Institute viewed Ms. Peak's application favorably and rigorously pursued the prospect of hiring Ms. Peak in a process which included multiple interviews and three reference

checks personally conducted by Hinds to validate Ms. Peak's fundraising experience and results.

14.     Within these interviews, Ms. Peak discussed and confirmed the expectations of the role.

15.     This included, for example, Ms. Peak's clarification in written slides provided to Hinds during one of the interviews that it would take twelve (12) to eighteen (18) months to secure a new major gift to the Institute from individual donors in circumstances where there is no pre-existing relationship between the donor and the Institute, and twelve (12) to twenty-four (24) months to secure a new major gift in the same circumstances from a donor that is a foundation; and, in the final interview including both Percelay and Hinds, her insistence that she would not accept a job where the metrics of success were judged based on deploying a personal "Rolodex" of donors she worked with previously on other causes to become donors for this new cause, to which Percelay and Hinds affirmed that deploying such a Rolodex was neither a criteria for hiring nor a metric for performance.

16.     On October 11, 2023, Ms. Peak received an offer letter from the Institute to serve in the position of Chief Development Officer.

17.     Over the following week Ms. Peak ironed out the details of the terms of her employment with Hinds, which, when completed, included a pathway to a significant pay increase upon meeting performance expectations related to fundraising.

18.     Ms. Peak accepted this position and began working for the Institute shortly thereafter in October of 2023.

19.     Ms. Peaks's role as the Chief Development Officer at the Institute entailed responsibilities including leading the planning and implementation of fundraising processes and serving as a member of the Institute's leadership team.

20.     In this role Ms. Peak reported directly to Hinds in his capacity as Chief Executive Officer and often interacted with the Institute's Board of Directors, including Percelay in his capacity as Chairman of the Board.

21.     Beginning when Ms. Peak joined and continuing throughout her tenure at the Institute, she observed that the Institute fostered a male-dominated work environment that persistently discriminated against women.

22.     This environment was primarily facilitated by Percelay and Hinds, whose actions frequently demonstrated hostility to women.

23.     As to Percelay, such actions included, but are not limited to, frequent demonstrations of a hostile attitude and demeanor towards women, including Ms. Peak, who attempted to express their opinions or make presentations at Board Meetings.

24.     This behavior, which occurred consistently across each Board Meeting and Board Committee Meeting that Ms. Peak attended, manifested in Percelay regularly speaking over women, responding in a rude and dismissive manner to them, and/or refusing to allow them to make their presentations as planned.

25.     Percelay did not exhibit similar behavior towards men at the Institute.

26.     Hinds likewise engaged in similar actions against Ms. Peak and others, including but not limited to, exhibiting a frequently hostile attitude and demeanor towards experienced female leaders at the Institute; speaking over women at Board Meetings; and making disparaging comments about such female employees, including commenting negatively on multiple occasions concerning the personality of a female employee or stating that a female employee was "annoying" or "irritating."

27.     This behavior was particularly emphatic when a woman expressed an opinion that

4

differed from Hinds', which appeared to reflect a sense of Hinds being intimidated or threatened by the possibility that a woman could have superior knowledge concerning the subject matter.

28. For example, on multiple occasions when a female employee would raise their opinion or present factual information to Hinds, he responded by stating that the women were being "emotional."

29. Hinds did not exhibit similar behavior towards men at the Institute.

30. As a result of the behavior she observed demonstrating differential treatment of female employees of the Institute, Ms. Peak developed serious concerns regarding potential gender discrimination.

31. She raised her concerns about this potential discrimination in multiple good faith complaints made to employees of the Institute positioned to respond to the behavior.

32. For example, beginning in December 2023, Ms. Peak had regular discussions regarding the negative treatment of female employees with the Institute's then Chief Financial Officer, Karyssa DeSorbo ("Ms. DeSorbo"), who also oversaw Human Resources at that time. Through these discussions Ms. Peak informed Ms. DeSorbo that she had frequently observed Percelay and Hinds engage in concerning behaviors towards women.

33. Ms. Peak's conversations with Ms. DeSorbo and the subsequent action that befell Ms. DeSorbo's employment strengthened Ms. Peak's belief that an environment that was discriminatory to women was being perpetuated at the Institute.

34. Notably, Ms. DeSorbo appeared to substantiate Ms. Peak's complaints by confirming that she had observed and personally experienced that Percelay and Hinds were engaging in hostile behaviors directed towards women.

35. Upon information and belief, Ms. DeSorbo shared Ms. Peak's concerns with the

behavior of Percelay and Hinds directly to Hinds in her capacity as the Human Resources lead for the Institute.

36.     Indeed, Ms. DeSorbo stated during her conversations with Ms. Peak that she shared similar allegations with Hinds in the past.

37.     Thereafter, in April of 2024, Ms. DeSorbo's employment with the Institute was suddenly terminated.

38.     Upon information and belief, Ms. DeSorbo's termination was unlawfully discriminatory and/or retaliatory based on her status as a female employee who had reported concerns of gender discrimination to Hinds.

39.     Notwithstanding the difficult environment, Ms. Peak performed well in her position.

40.     Indeed, in July of 2024 Ms. Peak earned a positive performance review from Hinds and, during the review process, Hinds stated that he was pleased with the progress Ms. Peak was making towards meeting the Institute's fundraising goals.

41.     Moreover, due to satisfactorily meeting the established performance criteria that was negotiated at the time of Ms. Peak's hiring, Ms. Peak received a full merit-based pay raise immediately following the July 2024 performance review.

42.     During the same period in July 2024 while Hinds was discussing Ms. Peak's performance with her, Ms. Peak raised directly to Hinds her concerns about the way she, as a woman, was being treated by Percelay and Hinds.

43.     In particular, Ms. Peak told Hinds that she felt that she was being treated dismissively because she was a woman.

44.     Ms. Peak thereafter continued her recurring efforts to observe and report instances

6

of concerning behavior towards women perpetrated by Percelay and Hinds.

45. This included reporting on a series of events that took place on September 14, 2024 at a fundraising event hosted by the Institute (the "September Fundraiser") at the historic Kennedy family home in Hyannisport, Massachusetts, a facility that was owned by the Institute.

46. During the September Fundraiser, which was coordinated by Ms. Peak as the event organizer, Percelay and Hinds engaged in several different acts involving hostile and demeaning treatment towards women, including towards Ms. Peak herself.

47. This included, for example, an instance where Percelay acted in an aggravated, rude, and dismissive manner towards Ms. Peak and the female manager of the Kennedy House following a technical issue connected to playing a video on a television monitor.

48. Meanwhile, only two months prior, a male Director of Information Technology ("IT") had shown the wrong version of a video that Percelay requested be played at a Senate Project event to over 250 guests. The Director of IT was not publicly reprimanded or terminated following this event and, upon information and belief, was not disciplined at all in connection with the event.

49. On the morning of September 16, 2024, Ms. Peak communicated on a Zoom meeting with Sara Maaiki ("Maaiki"), who was then working as Hinds' Chief of Staff and had ultimate responsibility for Human Resources matters, regarding the events that had transpired at the September Fundraiser two days prior.

50. During the Zoom discussion, Ms. Peak told Maaiki about the concerning behaviors that Percelay and Hinds had exhibited in connection with the September Fundraiser and noted that these behaviors were demonstrative of a broader pattern of conduct at the Institute.

7

51.     Ms. Peak also told Maaiki that she was aware of at least five other women at the Institute who had come forward with similar concerns and requested that she, as the most senior female executive at the Institute, give voice to their concerns.

52.     Maaiki's response to Ms. Peak's observations appeared to substantiate the underlying basis of the complaint, that being that there were potential gender discrimination issues at the Institute perpetuated by Percelay and Hinds.

53.     Indeed, Maaiki did not dispute Ms. Peak's observations and, instead, indicated that she was aware that a gender problem existed and that this discussion was not the first time that she received reports on hostile and/or demeaning treatment towards women.

54.     Moreover, Maaiki noted that she had discussed these issues with Hinds previously.

55.     Four days later, on September 20, 2024, Ms. Peak was fired.

56.     Specifically, at a meeting with Hinds, Ms. Maaiki, and a member of an external Human Resources service that the Institute utilized, Hinds told Ms. Peak that she was being terminated because she had interrupted a Board Member and because her tone in that interaction was curt.

57.     Hinds did not specify at the time, but Ms. Peak later learned that Hinds was referring to an interaction during the September Fundraiser.

58.     Hinds' claim was false and pretextual, as, in that instance as well as others, Ms. Peak regularly communicated professionally and appropriately with Board Members.

59.     Ms. Peak subsequently asked follow-up questions related to the rationale behind the termination, only for Hinds to change course and suddenly assert that Ms. Peak was being terminated due to unsatisfactory performance embodied by a lack of adequate progress towards

the Institute's fundraising goals.

60. Hinds' claim about unsatisfactory performance related to inadequate progress towards fundraising goals was likewise inaccurate, as Ms. Peak's July 2024 performance review completed by Hinds confirmed that Ms. Peak's work was more than satisfactory.

61. Following Ms. Peak's termination, the Institute opened a purported investigation into the reasons for her termination.

62. This investigation was a sham intended merely to protect the image of the Institute and its Board Members, and no good faith inquiry was made by the Institute into the truth behind Ms. Peak's termination.

63. For example, when the Institute's counsel conducting the investigation interviewed Ms. Peak, she provided assurances that Ms. Peak's former direct reports would be interviewed and instructed that they would be able to speak freely without fear of retaliation. However, multiple pertinent witnesses, including Ms. Peak's direct reports, were never interviewed.

64. After Ms. Peak filed a Complaint with the MCAD, Defendants responded with a Position Statement (the "MCAD Position Statement") which provided yet another new rationale for Ms. Peak's termination. Specifically, Defendants asserted that Ms. Peak was terminated due to the determination based on her performance that she had lied through purported representations made during her interview process about the "substantial Roladex [sic]" of donors she could deploy for the Institute.

65. This asserted rationale is also false and pretextual, as Ms. Peak never made such a representation about being able to deploy a Rolodex on behalf of the Institute. Instead, she in fact received confirmation from Percelay and Hinds that her hiring was not contingent on being able

9

to do so and that her performance would not be judged on her ability to do so.

66.     Subsequent to Ms. Peak's termination from her role as Chief Development Officer, the discriminatory and retaliatory environment that she experienced at the Institute continued to affect female employees of the Institute.

67.     For example, at least one senior female executive leader has since resigned from the Institute because of the discriminatory and retaliatory environment, and several others have also left, upon information and belief, for similar reasons.

68.     Moreover, several of the executive positions previously filled by female employees during Ms. Peak's tenure, including Ms. Peak's own position, were replaced with male employees.

## COUNT I
### Sex Discrimination (Against the Institute)

69.     Ms. Peak realleges and incorporates the above allegations as if fully set forth herein.

70.     Ms. Peak timely met the administrative prerequisites to suit under Title VII and M.G.L. c. 151B § 5.

71.     Through the conduct alleged above, the Institute engaged in sex discrimination against Ms. Peak in violation of Title VII and M.G.L. c. 151B § 4(1).

72.     As a direct and proximate result thereof, Ms. Peak has suffered and continues to suffer damages, including, but not limited to, loss of compensation and benefits, and emotional distress damages.

## COUNT II
### Retaliation (Against All Defendants)

73.     Ms. Peak realleges and incorporates the above allegations as if fully set forth herein.

74.     Ms. Peak timely met the administrative prerequisites to suit under Title VII and

M.G.L. c. 151B § 5.

75.     Through the conduct alleged above, Defendants engaged in retaliation against Ms. Peak in violation of Title VII and M.G.L. c. 151B § 4(4).

76.     As a direct and proximate result thereof, Ms. Peak has suffered and continues to suffer damages, including, but not limited to, loss of compensation and benefits, and emotional distress damages.

## COUNT III
### Aiding and Abetting in Violation of M.G.L. c. 151B § 4(5)
### (Against Percelay and Hinds)

77.     Ms. Peak realleges and incorporates the above allegations as if fully set forth herein.

78.     Ms. Peak timely met the administrative prerequisites to bring suit under M.G.L. c. 151B § 5.

79.     Through the conduct alleged above, Percelay and Hinds aided and abetted discrimination and retaliation in violation of M.G.L. c. 151B § 4(5).

80.     As a direct and proximate result thereof, Ms. Peak has suffered and continues to suffer damages, including, but not limited to, loss of compensation and benefits, and emotional distress damages.

## COUNT IV
### Interference in Violation of M.G.L. c. 151B § 4(4A) (Against Percelay and Hinds)

81.     Ms. Peak realleges and incorporates the above allegations as if fully set forth herein.

82.     Ms. Peak timely met the administrative prerequisites to suit under M.G.L. c. 151B § 5.

83.     Through the conduct alleged above, Percelay and Hinds interfered with Ms. Peak's exercise or enjoyment of her right to be free of discrimination on the basis of her sex, in violation of M.G.L. c. 151B § 4(4A).

84.     As a direct and proximate result thereof, Ms. Peak has suffered and continues to suffer damages, including, but not limited to, loss of compensation and benefits, and emotional distress damages.

## COUNT V
### Tortious Interference (Against Percelay and Hinds)

85.     Ms. Peak realleges and incorporates the above allegations as if fully set forth herein.

86.     Through the conduct alleged above, Percelay and Hinds, intentionally, with malice and through the use of improper means and/or motives, interfered with Ms. Peak's advantageous business relationships.

87.     As a direct and proximate result thereof, Ms. Peak has suffered and continues to suffer damages, including, but not limited to, loss of compensation and benefits, and emotional distress damages.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Peak respectfully requests that this Court:

1.  Enter judgment in her favor and against Defendants on all Counts;

2.  Award her compensatory damages;

3.  Award her emotional distress damages, with interest at the statutory rate;

4.  Award her punitive and liquidated damages;

5.  Award her attorney's fees and all other costs of litigation; and

6.  Order such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Ms. Peak hereby demands a trial by jury on his claims.

Plaintiff Pamela Peak,
By her attorneys,


*/s/ Patrick J. Hannon*
Patrick J. Hannon (BBO#664958)
Jacob W. Burkhead (BBO#714939)
Hartley Michon Robb Hannon, LLP
101 Federal Street, Suite 1810
Boston, MA 02210
P: (617) 723-8000
F: (617) 447-2800
phannon@hmrhlaw.com


Date 7/16/2026